The **BRIDGEPORT GUARDIANS,
INC.**, et al., Plaintiffs,

v.

Arthur J. **DELMONTE,**
et al., Defendants.

Civil No. 5:78cv175 (JBA).

United States District Court,
D. Connecticut.

June 2, 2009.

See also, 256 F.R.D. 308.

Antonio Ponvert, III, Michael P. Koskoff, Sean K. McElligott, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, Raymond W. Ganim, II, Law Offices of Raymond W. Ganim, Stratford, CT, John Michael Walsh, Jr., Licari & Walsh, New Haven, CT, for Plaintiffs.

Aimee Jennifer Wood, Pullman & Comley, Bridgeport, CT, Arthur C. Laske, III, Stephen F. Donahue, Laske & Brown, LLC, John Patrick Bohannon, Jr., Fairfield, CT, Mark T. Anastasi, Melanie J. Howlett, City of Bridgeport Office of the City Attorney, Raymond B. Rubens, Rubens & Lazinger, William J. Wenzel, Pullman & Comley, Bridgeport, CT, Harry B. Elliott, Jr., Meriden, CT, for Defendants.

## RULING ON MOTION TO STAY

JANET BOND ARTERTON, District Judge.

On March 12, 2009, 256 F.R.D. 308 (D.Conn.2009), the Court entered an eighteen-month Interim Modification Order in this decades-old case, incorporating the terms of a proposal jointly submitted by the Bridgeport Guardians, Inc. ("Guardians") and the City of Bridgeport ("City"), whose goal was to demonstrate a basis for eventual termination of the long-standing

remedial order. *See Bridgeport Guardians, Inc. v. Delmonte*, 553 F.Supp. 601, 609–19 (D.Conn.1982) (finding Defendants liable for race discrimination and granting relief through the terms of a remedy order issued thereafter). By a ruling issued that same day, the Court also denied two motions to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2), holding that the nine Movants—eight police officers in the Bridgeport Police Department ("BPD") and one civilian [1]—had failed to assert a direct, substantial, and legally protectable interest which, absent intervention, risks being impaired by the Interim Modification Order. *Bridgeport Guardians, Inc. v. Delmonte*, 256 F.R.D. 308, 310 (D.Conn.2009). The Movants, having appealed this denial of their motions to intervene, now seek a stay of the Interim Modification Order. For the reasons that follow, the Court finds that the Movants have failed to demonstrate that a stay is warranted.

## I. Standard

 In considering motions to stay orders pending appeal, courts apply four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999). In weighing these considerations, "the degree to which a factor must be present

varies with the strength of the other factors." *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir.2007).

 The key factor frequently is the first one—whether the entity seeking a stay has shown a "substantial" or "reasonable" likelihood that it will succeed on appeal. *Mohammed v. Reno*, 309 F.3d 95, 100–02 (2d Cir.2002) (finding "some uncertainty" as to the requisite probability of success, but noting that the degree varies according to the other factors and the circumstances of each case). A court that is called on to evaluate the correctness of its own ruling in order to properly weigh this factor is of course at some disadvantage, and one way to counteract its diminished detachment is to "turn to external, preferably objective, indicia of the accuracy of" the earlier determination. *Hayes v. City Univ. of N.Y.*, 503 F.Supp. 946, 963 (S.D.N.Y.1980), *aff'd on other grounds sub nom. Hayes v. Human Resources Admin.*, 648 F.2d 110 (2d Cir.1981). But even where the party seeking a stay "show[s] a substantial possibility of success on appeal, this factor does not override the balance of hardships." *Cooper v. Town of East Hampton*, 83 F.3d 31, 36 (2d Cir.1996).

## II. Discussion

Movants seek to have the Court stay the Interim Modification Order during the pendency of their appeal from the March 12 ruling denying intervention.[2] In their motion, the Movant officers claim that a stay is necessary because: (1) absent a stay, they will be subjected to "a racially discriminatory work environment," "racial-

---

1. The civilian Movant, who moved separately to intervene, has not moved for a stay.

2. The challenged provisions are set out in the Court's earlier ruling. *See Bridgeport Guardians*, 256 F.R.D. at 311–12 (quoting the pertinent terms of the Interim Modification Or-

der). For the convenience of the reader, the full text of the Interim Modification Order [Doc. # 1824] is attached to this ruling as an appendix. For further background on this litigation, see *Bridgeport Guardians, Inc. v. Delmonte*, 537 F.3d 214, 216–18 (2d Cir. 2008).

ly discriminatory promotional policies and selection procedures," and "racially discriminatory and exclusionary hiring and recruitment policies and practices"; (2) they otherwise "will be forced to compete in upcoming civil service promotional examinations under an explicit system of racial preferences"; (3) the existing "parties will suffer no identifiable injuries if the status quo is maintained"; (4) a stay will "serve the public interest" by conserving taxpayer resources through avoiding the expense and exposure of future litigation resulting from compliance with the order; (5) a stay "will avoid the inevitable exacerbation of racial tensions and antagonism in the [BPD] that the contested order will cause"; and (6) the Interim Modification Order "is inflammatory and threatens to arouse resentments and bitterness" among members of the BPD. (Movants' Mot. Stay [Doc. # 1830] at 1–3.)

The Guardians and the City object, contending that the Movants are simply rehashing arguments that the Court previously rejected in denying the motions to intervene, that the Movants have failed to show how the *Hilton* factors tip in their favor, and that granting a stay will be injurious to them. The Bridgeport Police Union ("Union") submitted a response purporting to "give[ ] notice that it supports and joins" the Movants' motion to stay—and also citing "additional interests" which it clarified at oral argument to be related to its view of collective-bargaining rights and its members' "personal rights" which it does not represent—but the Union did not itself move for a stay nor offer any authority in support of its position.

## A. Likelihood of Success

■ The first factor—likelihood of success on appeal of denial of intervention—

does not favor granting a stay. Although the Movants offer many reasons why they believe they have a meritorious challenge to the Interim Modification Order, nothing in their submissions demonstrates why the Court erroneously concluded that the Movants, having asserted no direct, substantial, and legally protectable interest, could not intervene as of right.[3]

The central interest originally asserted by the Movants was the potential interference with their promotion to detective positions in the BPD pursuant to a process separately challenged in state court. (*See* Heanue Aff. [Doc. # 1772] ¶¶ 3–6, 8–9.) In its earlier ruling, the Court specifically relied on the parties' representations, as clarified at oral argument, that the Interim Modification Order will not affect the particular detective-promotion process underway. *Bridgeport Guardians*, 256 F.R.D. at 314–15. In light of this understanding, the Court held:

> The Movants' interest related to the process for being promoted to detective thus falls away. With the parties' agreement that the detective list will not be affected by the Interim Modification Order or anything else in this case, there is no basis for granting the Movants a right to intervene to protect this interest.

*Id.* at 315. The Court also found that the Movants' claimed interests relating to officer safety and future promotions were factually and legally insufficient to justify intervention as of right:

> An argument that the actors in this case are not sufficiently concerned with the safety of BPD officers is extraordinarily difficult given the factual record, and the Movants have not cleared that significant hurdle so as to justify interven-

---

**3.** The Movants sought only intervention as of right pursuant to Rule 24(a)(2), not permis-

sive intervention pursuant to Rule 24(b).

tion.... Should they have a basis for believing that the composition of their workforce is dangerous, the Movants have pointed to nothing impeding their ability to bring such a challenge in the future. For all these reasons, the risk to officer safety is too speculative to justify intervention on this record.... Naturally, if the City did engage in race norming by weighting or evaluating BPD applicants differently according to their race, that could be unlawful under § 106. But the Interim Modification Order neither requires nor condones such differential treatment, and such future implementation of new hiring practices is speculative and contingent in any event. Thus, this claimed interest relating to future promotional opportunities cannot support intervention under Rule 24(a)(2).

*Id.* at 317–18. For similar reasons, the Court rejected the Movants' claimed interests in litigation records, attorney's fees, the claim-processing procedure, the assistant-chief position, and the BPD nondiscrimination policy, *id.* at 318–19, some of which the Movants have now abandoned.[4] Further, as an additional and independent ground for denying intervention, the Court held that the Movants lacked standing to pursue their claims and that the claims were not ripe for adjudication: "All of the Movants' asserted interests are speculative and conjectural, for the City has yet to take any action in response to the Interim Modification Order. And for the same reason, the hypothetical claims are unripe and premature." *Id.* at 321.

Movants have pointed to no factual errors in this analysis, nor have they shown why the Court's legal conclusions regarding intervention are likely to be reversed on appeal. Although the Court is mindful of the difficulty inherent in assessing the correctness of its own ruling, the Movants have provided no external, objective considerations that bear on this determination. This issue of Movants' right to intervene does not involve an unsettled area of law, for example. *See, e.g., Cooper v. United States Postal Serv.,* 246 F.R.D. 415, 419 (D.Conn.2007) (staying a declaratory judgment and permanent injunction in a case involving difficult and "thorny" Establishment Clause issues); *McConnell v. Fed. Elec. Comm'n,* 253 F.Supp.2d 18, 21 (D.D.C.2003) (staying final judgment in a case challenging the constitutionality of the Bipartisan Campaign Reform Act). Rather than reference relevant authority that they claim the Court overlooked, the Movants press their reliance on *Brennan v. New York City Board of Education,* 260 F.3d 123 (2d Cir.2001), without addressing the critical distinctions this Court earlier found:

In *Brennan,* another case involving a settlement agreement of race-discrimination claims, the Second Circuit found that the movants had raised a sufficient interest in the proceedings because their claims were identical to those raised by other parties. 260 F.3d at 130–31. The kind of interest asserted by the movants—loss of seniority rights—was held to be cognizable even though somewhat speculative because "the loss of appellants' relative seniority ... [was] central, rather than collateral, to the [settlement agreement]." *Id.* at 132....

[However,] [u]nlike the employees concerned about impairment of their seniority rights in *Brennan,* the Movants here—with the detective and new-applicant interests conceded to be out of the

---

4. The Movants clarified at oral argument on the motion to stay that they were not challenging the terms of the Interim Modification Order relating to geographic rotations, specialized units, the Assistant Chief position, and the Special Master's files. (*See* Interim Modification Order ¶¶ 4, 5, 7, 9.)

picture—are in effect claiming nothing more than a generalized interest in seeing the City and BPD comply with their non-discrimination obligations under federal law. *Bridgeport Guardians,* 256 F.R.D. at 313–14, 320.

A close examination of the terms of the challenged agreement in *Brennan* demonstrates why the facts here are distinguishable. In *Brennan,* after protracted discovery, the Department of Justice and the City of New York negotiated a settlement agreement aimed at resolving the government's disparate-impact claims targeting civil-service examinations and recruitment practices under Title VII of the Civil Rights Act of 1964. *United States v. New York City Bd. of Educ.,* 85 F.Supp.2d 130, 133–35 (E.D.N.Y.2000). Like the Interim Modification Order, the parties' agreement in *Brennan* contained general terms memorializing the defendants' non-discrimination obligations and commitment to comprehensive recruiting of minority candidates for employment. *Id.* at 135–36. But other provisions of the *Brennan* agreement were considerably more specific: the defendants stipulated that they (1) would not use the particular civil-service examinations challenged by the government, (2) may use the results of specific previously offered examinations so long as certain conditions are met, (3) would submit future written examinations to the government's expert, and (4) "must pro-

vide permanent, civil service status to 43 identified blacks, Hispanics, Asians, and women who have been serving provisionally" and "must provide retroactive seniority to 54 identified black, Hispanic, Asian, and female incumbent employees." *Id.; see also id.* at 138–47 (discussing in detail the quantitative impact of the settlement terms).

By contrast, the Interim Modification Order—which has a lifespan of only eighteen months—contains no corresponding provisions regarding the status or seniority of any particular BPD employees. Pursuant to paragraph 2 of the order, the City is allowed to bypass civil-service procedures including the "rule of one," but only in the context of recruiting and hiring new officers. *Bridgeport Guardians,* 256 F.R.D. at 311. Paragraph 12 further clarifies that the provisions of the order will have no impact on the detective promotions challenged in separate litigation. *Id.* at 311–12. The terms challenged by the intervenors in *Brennan* simply have no counterparts in the Interim Modification Order.[5]

In summary, the Movants have offered no new arguments demonstrating why the Court's conclusion that they have no right to intervene pursuant to Rule 24(a)(2) was reversible error. "[S]imply repeat[ing] objections and arguments that already have been considered by" the Court does not amount to a "strong showing that [Mov-

---

**5.** In the preamble to the Interim Modification Order, the Court explained that the basis for the order was not just the consent of the Guardians and City, but, critically, the terms and objectives of the remedy order issued a quarter-century earlier:

> This Order represents an appropriate measure to determine whether the City can and will achieve the goals of the Remedy Order—that is, to eliminate discrimination and achieve equal employment opportunities for officers in the Bridgeport Police Department. The following steps are race-

> neutral but are aimed at identifying and eliminating employment practices which may have an adverse racial impact.

(Interim Modification Order at 1.) Prior modifications to the 1983 remedy order which have been proposed through court-assisted negotiations have also been implemented in accordance with this Court's "ample authority to modify or vacate" the remedy order "as circumstances warrant." *Bridgeport Guardians, Inc. v. Delmonte,* 248 F.3d 66, 75–76 (2d Cir.2001).

ants are] likely to succeed on the merits." *Malarkey v. Texaco, Inc.,* 794 F.Supp. 1248, 1250 (S.D.N.Y.1992) (quoting *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113). Thus, this factor does not tip in favor of granting a stay.

## B. Remaining Considerations

■ Turning to the second factor, the question is whether the Movants have demonstrated they will be irreparably harmed absent a stay. As the D.C. Circuit has emphasized, "[t]he key word in this consideration is *irreparable.*" *Wisconsin Gas Co. v. F.E.R.C.,* 758 F.2d 669, 674 (D.C.Cir.1985). Movants characterize the harm to them as an "utterly disastrous scenario in which police officers promoted by the city pursuant to the terms of the order may find themselves demoted and their badges taken upon a finding that they were unlawfully promoted." (Movants' Mem. at 30.) Arguing vigorously that the Interim Modification Order will lead to unlawful employment practices at the BPD, the Movants assert that "[t]he order itself is blatantly racially discriminatory on its face." (*Id.* at 21.)

These arguments necessarily conflate the merits of Movants' discrimination claims with their right to intervene to assert those claims in this case. While it may be difficult to discuss whether they will be irreparably harmed absent a stay without in some sense considering the merits of their claims, Movants' assertions of harm are belied by both the law and the record. Unlike the challenged programs in the cases cited by the Movants—*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)—the Interim Modification Order authorizes neither quotas nor express preferential treatment, and so their claim that the order harms them (and everyone else) by being blatantly unconstitutional is in-

sufficient standing alone. Factually, the comparison to *Brennan* again is instructive: unlike the intervenors in that case, the Movants here do not face an immediate and specific alteration to their rights and interests as BPD officers. Perhaps most important to the question of irreparable harm as focused by the Movants is their previous concession that the Interim Modification Order does not preclude them in any way from separately seeking redress for discriminatory actions by the City. *Bridgeport Guardians,* 256 F.R.D. at 320 (noting counsel's acknowledgment at oral argument that "nothing in the joint proposed order ... in any way precludes or impacts any future litigation"). With nothing impairing their ability to enforce their statutory and constitutional rights to equal treatment on account of their race, the Movants are neither entitled to intervene as of right nor at risk of being irreparably harmed absent a stay.

■ The Guardians and the City, on the other hand, will be harmed by a stay of implementation of their carefully negotiated agreement. In their memorandum, the Guardians emphasize:

An immediate implementation of the Interim Order will allow the parties to continue to work together to create a better police department while enjoying the benefits of consensus over confrontation. A stay of the Interim Order will place the parties in a type of extended limbo which, given the history of this litigation, has the potential to return the parties to the antagonism of the past.

(Guardians' Opp'n [Doc. # 1842] at 8.) The Interim Modification Order was the product of a lengthy negotiation, ably assisted by Magistrate Judge Fitzsimmons, aimed at bringing about an end to this thirty-year-old case. Since 1983, the City and the BPD have been operating under the remedy order entered by Judge Daly, and

the parties have an important interest in expeditiously developing a track record to demonstrate sufficiently changed circumstances to warrant concluding federal-court supervision. The history of this case demonstrates the difficulty of achieving this goal. The parties previously jointly moved to modify the remedy order in 2006, but the Court denied the proposed modifications as insufficiently justified and instead ordered further public proceedings before the Special Master to work toward "orderly transition of the BPD from continued Court supervision." *Bridgeport Guardians v. Delmonte,* 238 F.R.D. 123, 125–26 (D.Conn.2006). In early 2008, the Court referred the parties to Magistrate Judge Fitzsimmons for settlement conferencing, and the parties engaged in extended negotiations over the course of several months. During this time, the City moved to vacate the remedy order, which was denied on consent in August 2008 when the Guardians and the City reached agreement on interim changes which they believed would expedite changes sufficient to justify vacating the remedy order. Their joint submission of the proposed order then prompted the Movants' intervention efforts—which, in turn, has stalled the City's implementation of the negotiated modifications as the BPD awaits resolution of the motion to stay. Continued delay, particularly in light of the history of this case and the carefully negotiated and time-sensitive terms, would threaten the joint efforts of the Guardians and the City to move toward a final conclusion.

■ The final factor asks whether the public interest will be served by a stay. Generally speaking, the public is best served by enforcing negotiated settlements and by allowing long-running civil actions to come to their final conclusion. *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.,* 319 F.Supp.2d 1094, 1108 (C.D.Cal.2003). In the context of this case, the public interest favors ending the longstanding

court oversight of the BPD and returning full responsibility for the operations of that department to the City. Residents of Bridgeport need and are entitled to a police department capable of functioning independently and lawfully without court supervision, which is precisely a goal that the Interim Modification Order envisions.

This conclusion that a stay is not warranted accords with other authority. In a long-running consolidated civil action concerning satellite-television services, the district court found that movants previously denied intervention were also not entitled to a stay both because they had failed to show a likelihood of success and because further delay of a carefully crafted settlement would adversely affect the parties:

> Furthermore, the Court finds that the issuance of a stay may substantially injure [plaintiff] NRTC and [defendant] DIRECTV who have been involved in this litigation since 1999 and are entitled to an expeditious resolution of the NRTC Actions. Both NRTC and DIRECTV argue that their contingent settlement will be adversely affected by a stay.... "[T]here is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." *Bianchi v. Perry,* 140 F.3d 1294, 1297 (9th Cir.1998). The public interest in this case would be better served by an expedient resolution of the NRTC Actions and the Class Action lawsuit.

*Nat'l Rural Telecomm.,* 319 F.Supp.2d at 1107–08. Other courts, after denying intervention, have similarly concluded that a stay pending appeal was not warranted. *See, e.g., Dillard v. City of Foley,* 926 F.Supp. 1053, 1060–62 (M.D.Ala.1996) (denying intervention to a neighboring city in a class action under the Voting Rights Act, and then declining to stay the consent decree given the absence of showing of

likelihood of success, lack of harm, and "irremediable delay" to the parties and the public in ending the "longstanding race discrimination lawsuit"); *Harris v. Pernsley,* 654 F.Supp. 1057, 1066 (E.D.Pa.1987), *aff'd,* 820 F.2d 592 (3d Cir.1987) (finding that the district attorney, having been denied intervention to object to a settlement over prison conditions, was not entitled to a stay pending appeal).

On distinguishable facts, in a dispute over lead poisoning and insurance coverage a district court denied a motion to intervene filed by tenant injured from ingesting lead paint but then stayed the action pending appeal based on the balance of hardships tipping entirely in the movant's favor:

> In sum, Ms. Seay has some colorable likelihood of obtaining a reversal of Judge Stein's order. There will be real harm to her if the instant case proceeds to conclusion prior to a final determination of her right to participate in it. On the other hand, there is no harm to Allstate from delaying a decision on its motion for summary judgment. Lastly, the public interest is not implicated in the determination whether to grant a stay in this case.

*Greenidge v. Allstate Ins. Co.,* No. 02–9796, 2003 WL 22871905, at *4 (S.D.N.Y. Dec. 3, 2003), *aff'd,* 82 Fed.Appx. 728 (2d Cir.2003). In this case, however, the balance of hardships favors the Guardians and the City, and the Movants have not demonstrated that their interests will be irreparably harmed absent a stay.

### III. Conclusion

Weighing the applicable factors, the Court concludes that the Movants have failed to carry their burden of demonstrating that a stay is warranted under these circumstances. Accordingly, the Movants' Motion to Stay [Doc. # 1830] is denied.

IT IS SO ORDERED.

### APPENDIX:

### INTERIM MODIFICATION ORDER

The Court, having reviewed the Joint Proposed Order submitted by Plaintiff Bridgeport Guardians, Inc. ("Guardians") and the Defendant City of Bridgeport ("City"), and having heard the parties and considered their submissions, hereby issues the following Order modifying the Remedy Order for an interim period of 18 months. This Order represents an appropriate measure to determine whether the City can and will achieve the goals of the Remedy Order—that is, to eliminate discrimination and achieve equal employment opportunities for officers in the Bridgeport Police Department. The following steps are race-neutral but are aimed at identifying and eliminating employment practices which may have an adverse racial impact.

1. *Promotions and Hiring.* The City shall evaluate all promotional and entry-level hiring examinations to determine whether the examination results and selection procedures evidence a disparate impact on black or other minority candidates. The City shall take all appropriate and available steps to reduce any disparate impact of examinations or procedures on minority candidates by utilizing race-neutral measures, including the appropriate weighting of the oral and written portions of the examination to reduce the disparate impact while preserving the validity and usefulness of the examination.

2. *New Recruit Hiring.* With regard to any entry-level hiring list created by the City between the effective date of this Order and September 1, 2010, the City shall evaluate all entry-level hiring examinations to determine whether the examination results or procedures evidence a disparate impact on minorities. The

City shall attempt to reduce any identified disparate impact on minority candidates by utilizing race-neutral measures, including the appropriate weighting of the oral and written portions of the examination to reduce the disparate impact while preserving the validity and usefulness of the examination. In addition, the City, through the Chief of Police, may, within the Interim Period and notwithstanding any contrary provisions of the Bridgeport City Charter and/or the Civil Service Rules and Regulations, interview candidates to determine their suitability for employment. The City, through the Chief of Police, shall be empowered, notwithstanding the provisions of the Bridgeport City Charter and/or the Civil Service Rules and Regulations, to suspend the "rule of one" in selecting a recruit class from any existing and newly created hiring lists during this Interim Period. The Court will consider at the conclusion of the Interim Period whether a permanent suspension is warranted to eliminate barriers to equal employment opportunity.

3. *Recruitment.* The City shall allocate the payments identified in paragraph 10 to a fund to be created and dedicated for the recruitment of minority and female candidates for entry-level positions. These payments may not be used to reduce the Bridgeport Police Department's current expenditures, but shall constitute "new money" for this purpose. The funds shall be expended by the Chief of Police for appropriate recruitment efforts conducted by departmental personnel and/or qualified neutral third parties mutually agreed to by the City and the Guardians.

4. *Geographic Rotations.* The Remedy Order provisions mandating geographic rotation of patrol officers are hereby suspended and the Chief of Police shall have discretion to rotate officers throughout the geographic sectors of the City in a race-neutral manner.

5. *Specialized Units.* Half of the positions within each Specialized Unit shall be staffed at the discretion of the Chief of Police and half shall be staffed pursuant to the requirements of the applicable collective bargaining agreement. The "extra" position in Units with an odd number of positions may be staffed at the discretion of the Chief of Police or pursuant to the requirements of the applicable collective bargaining agreement. During the Interim Period until pending litigation in Connecticut State Court is finally resolved, the NET Team shall not be considered a Specialized Unit for the purposes of this paragraph. In the event that State Court litigation over the NET Team is resolved within the Interim Period, the parties may apply to the Court to request that the NET Team's status under this Order be reconsidered.

6. *Complaints of Race Discrimination.* The Chief of Police shall hear and decide individual complaints of race discrimination and harassment within 30 days of filing, except in those cases that require the investigation of the Office of Internal Affairs, which shall be decided within 60 days of filing. The complainants shall have a right of appeal to the Board of Police Commissioners, in addition to all other rights under

state and federal law. All adjudicatory duties and responsibilities of the Special Master shall return to the Bridgeport Police Department, except that all complaints pending as of the date this Order is filed shall be heard and decided as set forth under the currently operative terms of the Remedy Order and all other applicable court orders. All other filing obligations and administrative reporting requirements under the Remedy Order are hereby suspended, except that information sufficient for the Court to assess the existence of changed equal-opportunity circumstances shall be retained and made available to the Court on request. To the extent that the Office of Internal Affairs reported to the Special Master pursuant to the Remedy Order, such reporting shall now be to the Chief of Police.

7. *Assistant Chief.* An Assistant Chief is necessary to assist the Chief with, among other things, the implementation of this Order and all other matters pertaining to the fair and equal treatment of Bridgeport Police Officers. Within three months of entry of this Order and as often as necessary thereafter during the Interim Period, the Court will evaluate the parties' progress in implementing this Order and will enter any orders needed to effectuate the appointment by the Chief of an Assistant Chief, notwithstanding any contrary provisions of the Bridgeport City Charter and/or the Civil Service Rules and Regulations.

8. *Non–Discrimination Policy.* The City shall adopt a non-discrimination policy to be incorporated as part of the policies and procedures of the Bridgeport Police Department, which shall be subject to approval by the Court.

9. *Files of the Special Master.* Once all complaints remaining pending before the Special Master have been heard and decided, all files related to this case in the possession of the Special Master shall be disposed of in the following way: The City shall review the files and provide to the Court any files related to complaints which resulted in the issuance of a Court Order. The City shall make an electronic copy of all the Special Master files with a corresponding catalogue and provide electronic copies of that information to the Court, the Special Master, the Guardians, the law firm of Koskoff Koskoff & Bieder, the Bridgeport Police Union, and the City. The City shall preserve its electronic copy for review by the public. Once these steps have been taken, the City may destroy all case-related paper files in the possession of the Special Master.

10. *Sanctions.* Of the monetary sanctions currently recommended to be imposed against the City, the City shall allocate $300,000, in six annual installments of $50,000 commencing with FY 2010, towards the recruitment programs described in paragraph 3. The City may accelerate payments in its discretion if necessary to effectuate the provisions of this Order or to otherwise create changed circumstances before the end of the Interim Period. If and when changed circumstances warrant the termination of the Remedy Order, the remaining sanctions will not be imposed, subject to the City's satisfactory compliance with this Order.

11. *Attorney's Fees.* The City shall pay $300,000 in attorney's fees to the Guardians' counsel, Koskoff Koskoff & Bieder, such payment to be made within 90 days of the filing of this Order. The City and the Guardians represent that this award of attorney's fees corresponds to only a fraction of the uncompensated hours worked by the Guardians' counsel over twenty-five years in the enforcement and implementation of the Remedy Order. At the request of the Mayor of Bridgeport, Koskoff Koskoff & Bieder has agreed to forgo seeking over $1 million in additional fees for which the City of Bridgeport might otherwise be responsible.

12. *Relevance of this Order to Union Negotiations.* Nothing in this Order shall be used to the advantage or disadvantage of any party in collective bargaining negotiations or interest arbitrations occurring during or after the Interim Period. This Order, related proceedings, and any changes to the operation of the Bridgeport Police Department required to comply with this Order shall be inadmissible in such negotiations and arbitrations. The status quo for the purposes of any interest arbitration that occurs during the Interim Period shall be as it existed prior to the entry of this Order. This Order also shall not have any applicability to implementation of final court orders in the case of *Burke v. Bridgeport Civil Service Commission.*

13. *Interim Period.* At the conclusion of the interim period on September 1, 2010, the parties may move the Court to vacate the Remedy Order and that motion will be decided based upon a review of the results of the City's compliance with this Order and a review of changed circumstances since the 1983 Remedy Order that may justify the vacating of that Remedy Order consistent with applicable federal law.

14. *Status Report.* The parties shall file a joint status report on June 12, 2009 summarizing the status of the City's steps to implement this Order.